We have six cases on the calendar this morning. Two of them are being submitted on the briefs and therefore will not be argued. The first is in Re, Eric Brunetti, 2023-1539, Mr. Sommer. May it please the Court, John Sommer for Appellant Eric Brunetti. It's been a while since this case was briefed so I have a few points I'd like to make initially. First, I think this would be a good case to instruct the Bar and the government not to be citing the Trademark Manual of Examining Procedure for Substantive Law. And I'll just point out that then-Circuit Judge Gorsuch discussed that in Ellen Canto v. Hatch-Chilley, 825 Fed 3, 1161. Second, there's a related case that makes almost the exact same arguments in the briefs that has some interesting differences. In Re, Federal Bar Foundation, the case number is 24-1071. Third, as of today, there are 2,270 registrations that include the F word, but of course not Eric Brunetti. You argue there's no such thing as a failure to function rejection and you argue that that's not what they did here. And it seems to me that we have a couple of cases in our court and the Supreme Court in the Qualtech's case recognized there is such a thing as a failure to function rejection and that's what they purported to do here. So what's the problem? Well, the, I mean, and by the way, I'd like to sort of deal, well, I guess a good point is, I'd like to approach this from a presumption point of view. The Congress enacted what presumptions are in the Land of America and what aren't. Here, the trademark office has created two presumptions. First, if there's any use anywhere on unrelated goods and services, it doesn't have to even be that. It can be a tweet, a blog, it is widely used. The second presumption is if it's widely used, the public cannot perceive it as a trademark. So if you look at the decision below, and by the way, those presumptions are, the only way to overcome that is if you're famous, as in the In Re Lizo case, or if you have a survey. And there's a Law Review article in Trademark Reporter in 2024, 114 Trademark Reporter 649, called Phantom Rules. And so the only way, if this is raised, because it's always going to apply if it's raised, is if you spend $100,000. You don't have to spend $100,000 to get a marked register. And in the case of an intent to use application as this, you can't file a survey at all because you have no use. So the presumption is irrevocable. So the trademark has created presumption because what it's gone from is the informational refusal originally was general information about the goods or services, take twice today, I drive safely, which has gone to then a common phrase used in advertising, which now has gone to the consumer is accustomed to seeing used in everyday speech in a variety of sources, which is a completely new thing. But this is being refused not because it's informational, because everyone agrees it's not informational as to the goods and services applied for. It's being refused because it's an informational sentiment. It's a feeling. And there's no law I've ever heard of that says that. Now, I grant that you can always, you know, I think Professor Roberts' article is very good. You know, you have the spectrum of distinctiveness, and you have the extent you're using as trademark use. And if it's not being used as a trademark, but see here, the trademark office, that's a critical invention in 2017. Before that, you could file a new specimen. But in 2017, they say once we've decided this applies, you can't file a new specimen. And then the, I guess the final initial point I'd just like to make is it's about evidence waiver, their argument. Does the, under 45 of the Trademark Act, is the evidence required to show an intent to use different from a trademark that you're, that's already in use? Well, no. It uses an application for use, correct? Yeah, well, it's an intent to use application. Okay. So we don't have, but we do have actually in this case, unlike many intent to use applications. This is. Renetti actually is using F-U-C-T. And so he's now filing for an intent to use for F-U-C-K. And, you know, the whole reason we got up to the Supreme Court in the first place is the trademark office says they're equivalent. And now they say they're not equivalent because the Supreme Court says we have to allow you one. But the trademark office. This is, we're talking about an application for intent to use in your case, correct?  Is evidentiary standard different for an application for intent to use than, say, an application for a trade for a product that's used, already in use? No, no. The intent, well, there's no difference. I mean, yes. He only has to say that he has a good faith. Is it yes or no? The answer is no, if I get the question correctly. For intent to use, you don't have to have any evidence for use. But in this case, he actually has evidence of how he will be using it, which is normally you just intend to use. Is there a different consumer perception application? No. No, the test should be the same. Well, it can't be a consumer perception if it hasn't been used yet. Well, that's my whole point, is the trademark office created these two presumptions. And for an intent to use application, it's irrebuttable. And my point, I think, is that almost all trademarks, if the test is what the PTO says it is, virtually all trademarks are refused because if you do a Google search, it would be very difficult to find any word that's not used at least four times or even a dozen times. And so all trademark applications almost will be refused if the trademark office decides to raise it. And, of course, that's sort of a subsidiary problem. Sometimes they raise it and sometimes they don't. They only seem to want to raise it if it's something that they were refused, that the Supreme Court told them they couldn't refuse. But if virtually all trademarks are refused, then that gets back to Sir Karl Popper. If it's always true, then it can't ever be disproven. Then it can't be a valid doctrine. But this is a completely new doctrine that, you know, this is where Emma Long-Gilson's article is so useful. She says that this trademark office has completely lost context because up until before 2017, a trademark was generic or refused based on the goods and services applied for it. The theory starting in 2017 is if we can find four uses anywhere in a blog, a tweet, then it can be refused. And see, the thing that I think the trademark office has forgotten is this doctrine now can be used in a party's proceedings. So if you want to cancel a registration, I want to cancel Apple. Actually, Apple is widely used. It is widely used. And so, therefore, this doctrine applies. So I think I've said what I want to say. I've asked the government. I've given the government some questions I'd like them to answer. And I'd be happy to reserve my time until we get some answers. We will serve it for you. Thank you. Mr. Hensherwood. Good morning, Your Honors, and may it please the Court, Brad Hensherwood. A proposed mark is only registrable if it serves to identify and distinguish the source of goods or services. Let me tell you what my problem is. Yes, failure to function is a ground for rejection. And we've established that in a couple of cases. The Supreme Court recognized it in Qualitex. What I'm concerned about is I'm not sure that I understand what the PTO's scope determination is for failure to function. Yes, it includes, you know, commonly used phrases, things like that. But what's the rule? I mean, I find it difficult to parse the decision here. And I don't think that it's really an answer to say, oh, well, each mark is judged on its own merits and we don't look to establish consistency in PTO practice. But what is the rule that's being applied here for rejecting this application? This is fundamentally about the basic question of whether or not when consumers perceive this proposed mark in the marketplace, they will think or could be able to think, oh, that's a brunetti. Right? It's identifying the source of goods and distinguishing them from others. What about things like Apple and Shell? You know, those seem to have the same problem. No, Your Honor, for a couple of reasons. One is the board here looks not only at the fact that the term is widely used, but there's much more texture to that than just saying the word is frequently used, which I think is how my colleague understands it. It's not just the word is frequently used. It's that it's frequently used to convey a particular message to people perceiving it, people viewing it. That's why it's on shelves. Why is this different from Apple and Shell? Your Honor, those are entirely arbitrary as to the particular goods for which they are registered. Here, the marketplace, as the board explained, is full of goods of the same type and related types to the goods that brunetti has applied for here that have this proposed mark displayed to convey a message. So is prior use the thing that distinguishes this? It's not prior use. Again, it's an inquiry into consumer perception. How will consumers understand this proposed mark? I don't understand what you're saying. What's the difference between this mark and Shell and Apple, for example? What's the difference? Yes, maybe those marks have now acquired secondary meaning. Everybody knows that Apple and Shell are trademarks. That's fine. But at the inception, when the mark is being registered, there presumably wouldn't be any consumer perception. Why are those different from this one? I'm having trouble here. Your Honor, when someone before, when Apple was initially trademarked, saw a picture of an apple with a bite out of it on the side of a computer, I don't think anyone thought or would have thought, could have reasonably been thought, to understand that was conveying some sort of message about apples, about diet, about food, about anything. It's, in that sense, not conveying any message at all, except to function as identifying, okay, well, that must be the logo of the company that made that computer, that made that product. So the idea was that it was being used in a way that the public perceived it as a trademark already? Not just used, but also, again, that there's not this sort of competing universe of things in the same classes of goods, in the same types of goods, conveying a message about, you know, the way this particular thing is being used. I don't understand what you're saying. I really don't. So how can we really show that the consumer would perceive when there is an intent to use the application? No, I think the standard is the same as across all applications, insofar as what you have to show is that consumers would or are capable of perceiving the mark as source identifying. And in this particular instance, it may be more difficult to do. In the evidence that's shown, how do you show what a consumer would perceive if the actual goods are not out in the marketplace? Well, again, I think you don't have the same concerns often where there's not sort of a marketplace that's awash in goods in exactly the same classes or related classes, related products. I don't think you have to say that. It's often the case that a trademark that's being considered or a mark that's being considered can exist in a myriad of different classifications, like here, handbags, shoes, coats, jewelry, et cetera. So what type of evidence is Mr. Brunetti supposed to present to show intent to use? How do you show consumer perception at that point? Look, I think it would probably be difficult, given the nature of this particular proposed mark in the classes for which he has applied for it, to demonstrate that consumers are going to understand it as a trademark. I'm saying that this isn't a new mark, that this word has been out there in association with all sorts of emotions and uses. In that respect, it has not been associated with particular goods, and therefore the intent to use now cannot be either that the word has already been out there. I think that's the basic intuition. Of course, the more that a particular proposed mark or word or phrase is used... So prior use for the same kind of goods makes it a failure to function? It's certainly focused on the particular goods in the application. Absolutely. I don't want to... Is the answer to my question yes or no? Is it because of the prior use for the same kind of goods that makes it a failure to function as a trademark?  I don't want to endorse necessarily prior use as a technical term, but certainly the fact that it's widespread... What do you mean not a technical term? I'm asking you a simple question. What's the answer to it? Is it because there's prior use for the same class of goods that it doesn't function as a trademark? Is that the key here? That's certainly relevant, yes. That's one part of the evidence that the Board looked at. What's the other part? The other part... So the Board broke its analysis into two parts. It said, look, the examining attorney here has amassed considerable evidence that consumers understand this proposed mark when they see it as sort of all-purpose intensifier. They see it in a variety of contexts. They use it in a variety of ways, and they're going to understand it as conveying a message when they normally see it. And then second, it looked at the record evidence the examining attorney had amassed to show that, in fact, there is extensive use of this exact proposed mark on goods identical to or similar to the goods in these applications, not some other, you know, goods that have nothing to do with what's going on here, but in this specific context, the market is full of these. And, you know, that is more than sufficient, as a matter of substantial evidence review, to demonstrate that there was a prima facie case... It's not a question of substantial. It's a question of whether there's a coherent definition of failure to function. And I understand what you're saying, that there's evidence that the same class of goods bore this mark previously and that that suggests there's a failure to function as a treatment. I understand that argument, but I don't understand the rest of what you're saying as to somehow this word is different from shell or apple if you take away the prior use situation. Again, I think it goes to the types of goods for which it's being used and the types of messages that are being conveyed. You're trying to mush this up so that there's no coherent rule. Part of our job is to apply coherent rules to similar facts. And, you know, that's a basic part of administrative law, which is binding on the PTO as well as every other agency. You have to have a coherent articulation of what the rule is so we can understand how to apply it in one case after another. And I'm trying to pin you down as to what it is that the PTO is doing here. I understand the prior use argument. I understand that. That makes sense. I just don't understand what else. You seem to say there's something else here, and I'm not seeing what the something else is other than it's a common word in use that could mean all sorts of different things. That's true of a lot of different words, and it's not limited to this one. No, no, I think it's a little bit more than just it's a common word. I think that's the way that my colleague has tried to portray it, but the Board explained it's not just that it's a common word. It's the way that word is used, and it's the way that word is used in the context of the goods and services at issue here. So I think certainly, you know, to the extent you need to. When is that determination made that it's a common word? Is a failure to function test a threshold determination that's made? Well, it's the very definition of a trademark or service mark is that it has to function to distinguish these goods and services from others. So you're telling me that in every case, in every application, you will apply the failure to function test? I mean, certainly no trademark should be registered unless it meets that standard. Whether or not it's explicitly applied in every case, I couldn't say, in part because there are going to be instances where you don't have these concerns. These issues aren't raised in the way they obviously are here. If you see K, is it already registered? So my colleague has pointed to different examples of other registrations that use that term in conjunction with others, for example. There are some, but again. Excuse me. And was a failure to function test applied to those registrations? I haven't reviewed every record for those registrations, but I would just say with that word and with others, if you go and look at some of the registrations my colleague pointed to, for example. In review, does it make a difference? Does it matter? Can I give you one example? So F, cancer, was one example that my colleague pointed to that the PTO has registered. There, the C and the K are made to look like the cancer awareness ribbon, right? So it's a stylized mark. It's not just the words and standard characters, which is what he's requested here. The snow globes example. Right. I haven't reviewed the full record for that. Again, but the fact that, for example. Trust us. We don't have to articulate a coherent rule. Trust us. Certainly, those are not decisions of the board. And so I want to, if you look at the board's decisions, the board has been consistent in the way it has applied this doctrine for years, even predating 2017. Drive safely. Fragile for stickers, not for other things. Drive safely for cars, not necessarily for other things. The fact that the board's decisions, I think, provide a coherent. I understand that the board has been rejecting slogans like that. We've affirmed that, and that is understandable and makes sense. This is not a slogan like that. It's a word that is in common use, and it may be rejected because of prior use by others, which makes it failure to function. But you're arguing for something more than that. And I'm, like Judge Reyna, I'm having trouble knowing what that is, what the standard is. This is the whole essence of administrative law. You've got to be able to articulate understandable rules. I think the fact that it's a word in common use, as you point out, makes it even more troubling to think that someone could trademark it and take it out of use for other people and have claims of infringement for that use. That's a point this Court made in its decision in Geo. And I think that's an illustration of why it's important for the PTO to police these lines and protect those interests of other people who want to be able to use this proposed mark in ways that might get them. The problem I'm having is that it just seems to me that this whole process is open for a situation where people at the PTO can say, look, here's this word. I think it's scandalous. I don't want this to be registered. And guess what? It doesn't function. And it seems to me that the failure to function test, the way it's been applied in this case, it's self-defeating. You can defeat anything you want. You can let Apple go by and let these other terms go by, but you won't let F-U-C-K go by because it's scandalous. First of all, I think Apple is fundamentally distinguishable on multiple axes from something like this, where, again, we're looking again at the context of specific goods and services identified in the application. We're not, you know, if this was F-U-C-K for computers, we might be having a different conversation. I think we'd be having a very different conversation than if it was for shirts and hats. You're just saying there are no rules. You know, each case is judged on its own facts, and there's no requirement of consistency. Your Honor, I'm certainly not suggesting there's no requirement of consistency. I'm certainly not suggesting that the PTO can just make it up as they go along. But this is ultimately an evidence-based inquiry. Consumer perception and consumer understanding is an evidence-based inquiry at bottom. And that's the same reason why this Court in Geo and Vox Populi. Do we have to show a nexus between the proposed mark and the evidence? Has there got to be a nexus? The answer is yes. There's got to be some form of nexus. How do you have a nexus in an application for intended use when the good has not been out in the marketplace? How do you judge consumer perception in that situation? You're looking at whether when consumers see this, they're going to understand it. As potentially identified. The good's not out in the marketplace yet. It's certainly going to be more difficult in this context to take a word in common use and remove it from others' ability to use it at that point when it's already. Again, we have a marketplace that is full of exactly these kinds of products, and we're trying to put a trademark, a proposed mark, that is widely used by people in the marketplace, by consumers, across a variety of contexts as sort of an all-purpose intensifier. And that is not the kind of thing that ordinarily gets removed from sort of public use by someone claiming exclusive rights through a trademark. And Supreme Court decision in Qualitex, there's a suggestion that something that fails to function as a trademark can be registered if it's acquired secondary meaning. Would that be true of the F word, too? There's no claim of secondary meaning.  Hypothetical question. Please answer it. Supreme Court in Qualitex said that color, which fails to function as a trademark generally, can function as a trademark if it's acquired secondary meaning. Would the same thing be true of the F word if it became associated with their particular good? So an acquired secondary meaning, would it then become registrable? So certainly if Brunetti could come back in the future and demonstrate by evidence that now consumers do understand this as my product when they see the F word on a phone case, then that would be a different inquiry and it may well be registrable in that context. But that's plainly not the case here. There is zero evidence that consumers would perceive the mark in that way. Thank you, counsel. Mr. Shimer, we're on the same considerable time. You've got it. Yes, thank you. Seven minutes plus. I'd like to address some of the things my friend said here. First, he's arguing that a message can't be a trademark. The Supreme Court made that absolutely clear, that a message can be a trademark. Trademarks do have that. Second of all, love, hello, mom, those are all powerful trademarks. Love is registered by the United Way, Cartier, but of course, you know, Brunetti is different than that. But those words, how do you distinguish love from this word? There is no way to distinguish them logically. Second, it was represented that the record's full of evidence that the F word is widely used with the applied for goods. As pointed out in my Appendix A, there's no evidence, except for a little bit of irrelevant evidence as to 14. You didn't submit any evidence, correct? No. Consumer perception. Yeah, I submitted no evidence of consumer perception. That's correct. But I did submit evidence that Brunetti was going to use this mark in the same way as he uses the F-U-C-T mark that is on neck labels. So that's a trademark view. Because I think your point that the trademark office, I think, has just undercut its case because its position is that no specimen can be submitted once this failure function objection has been raised, which is the novel thing that got invented in 2017. But now we're saying, well, maybe you can. But the record has no evidence as to the use of this term in any class other than 14. So it's just sunglasses and nine, retail services and 35. One point I do want to make is the bill has been wrong about using fake evidence or created evidence or whatever you want to call what the government's using here. And if the government can use that, that means parties and any party proceedings can start using that. And that means, of course, perjury is not a crime anymore. So I think that's a bill that needs to be definitely taken care of. You cannot use fake evidence. The PTO won't let parties use fake evidence, but apparently it can. And I'd like to sort of go even broader because all the cases the PTO cites, well, it has no Article III case that supports the doctrine that widely used on unrelated goods and services is a ground to refuse. Now, I agree that if it's generic or you're not using it as a trademark or generic or descriptive, but those things don't apply here. And so this principle that if it's widely used on unrelated goods and services, and I find it absolutely amazing to say a tweet, a blog, because if that affects a case, you know, a disgruntled employee can destroy any trademark by just writing a few blogs. So all the cases they cite are TTAB cases, and they're all misread because if you look at the record in the cases, it's all specimens that are not trademark use, large in the front instead of the neck label. And the only one exception to that is DC-1 Retailer, which all the evidence shows that it's big use in the front, which is not a trademark use, except there are two little neck labels. And that's the whole read that this doctrine is based on is DC-1 Retailer. And that was the default case. And it's a TTAB. There's no Article III court. And my daughter is a U.S. Marine, and I know the U.S. Marine Corps would be amazed to discover that EGLCREST stands for what the government argues is that once a Marine, always a Marine can't be registered. The Marine Corps has five registrations for that. Are there any questions? Thank you, Mr. Sumner. The case is submitted.